UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

RALPH M. MOHR

Plaintiff,

v.

ERIE COUNTY LEGISLATURE,
Barbara Miller-Williams, Chairperson;
Robert M. Graber, Clerk of the Legislature,
CHRISTOPHER C. COLLINS, as County Executive
Of the County of Erie and
COUNTY OF ERIE,

Defendants.

**Civil No.: 11-CV-559S**

---

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF PROTECTING BALLOT ACCESS**

**JEREMY A. COLBY, Erie County Attorney**
Attorney for Defendants
95 Franklin Street, Room 1634
Buffalo, New York 14202

## PRELIMINARY STATEMENT

Defendants County of Erie and County Executive Chris Collins (collectively "the County Defendants") submit this Memorandum of Law in support of protecting ballot access as directed by the Court. The County Defendants urge this Court to issue an Order that provides for an abbreviated timeframe to circulate nominating petitions and a reduced signature requirement of 200 signatures. The County Defendants also respectfully ask this Court to quickly adopt a re-districting plan that satisfies all legal requirements (obviously) and that places the needs of the represented communities above the interests of politicians. Advocates with a political agenda will seek to restrict ballot access (by suggesting party designations) and will generally follow a strategy of delay in an attempt to argue that "it is too late" to follow democratic processes such as the circulation of nominating petitions. Crucial First Amendment and voting rights are at stake and this Court must be a bulwark against those forces who would sacrifice these rights in favor of political special interests. A modified schedule for circulating petitions is feasible and permissible as this Court recognized in Kimble v. Niagara County.

**Point I**

**THE COURT IS AUTHORIZED TO ADJUST BALLOT ACCESS**

In Kimble v. County of Niagara,[1] this Court modified deadlines and the petition process to preserve ballot access. This Court approved a stipulated reapportionment plan and established the means for its implementation. In so doing, this Court recognized that it has considerable discretion to fashion a remedy in curing a 14th Amendment violation.[2] This Court authorized a reduction in the number of signatures needed to qualify for ballot access.[3] In Kimble, candidates collected signatures from the existing districts and this Court agreed that it was proper to use existing district lines "solely for the purpose of collecting such signatures."[4] This Court also approved the parties' agreement to reduce the number of signatures required for a petition.[5] As a result, this Court concluded that the proposed approach for ballot access was "a fair and expeditious method of selecting candidates for the County Legislature."[6] After the 1993 election, the petition process was to revert back to the normal procedures.[7]

Under Kimble, this Court is authorized to modify the petition process to ensure ballot access and to otherwise implement measures necessary to remedy violations of federal law

---

[1] 826 F. Supp. 664 (W.D.N.Y. 1993).

[2] Id. at 669.

[3] Id. at 671.

[4] Id.

[5] The number of signatures was reduced to 50 for Republican and Democratic parties, 75 for independent candidates, and 3 for candidates for the Conservative, Liberal, and Right-to-Life parties.

[6] Id.

[7] Id.

resulting from a county legislature's failure to reapportion election districts in accordance with census data.

Other courts have issued orders altering election calendars and the petition process in order to safeguard constitutional rights. For example, in Vasquez v. Lake County, the court extended the deadline for filing nominating petitions by more than three weeks for county legislative seats.[8] One judge in the E.D.N.Y. has even gone so far as to order a person's name added to the ballot for a special election even though he did not receive the required number of signatures on his petition.[9]

---

[8] 2001 WL 1662093 at *2 (N.D. Ill. 2001) (extending deadline to file nominating petitions related to the election for seats on the Lake County Board).

[9] Sharpe v. Como, 2007 WL 1175221 at *6-7 (E.D.N.Y.). In Sharpe, the calling of a special election was manipulated such that when the time for petitioning began, the defendant's petitions were being carried immediately while the plaintiff required several days to get up and running. The defendant was working in concert with the person charged with officially calling the special election. Since plaintiff was not afforded the same benefit as the defendant, and the petitioning process was already abbreviated to begin with, plaintiff did not receive the required signatures required by the deadline.

**Point II**

**THE CONSTITUTIONAL RIGHTS AT ISSUE ARE SIGNIFICANT AND MUST BE PROTECTED BY THE COURT**

The rights at issue here – ballot access to run for office and carrying petitions to support a candidate -- are fundamental. Individuals have an "associational right to vote in a party primary without undue state-imposed impediment."[10] The rights afforded to a voter by the First and Fourteenth Amendments do not bar a state from imposing restrictions on the election process that are reasonable and nondiscriminatory.[11] Election laws that unreasonably interfere with the rights of a voter to associate and have a candidate of his choice appear on a ballot violate the First and Fourteenth Amendments.[12] With respect to ballot access, the Supreme Court has stated that its "primary concern is with the tendency of ballot access restrictions to limit the field of candidates from which voters might choose."[13] Accordingly, when reviewing "candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters [because] [t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights."[14]

While legitimate restrictions may be placed on elections and the petition-carrying process, a local government may not violate its citizens' constitutional rights. Petition circulation "involves interactive communication concerning political change . . . [and]

---

[10] New York State Board of Elections v. Lopez-Torres, 522 U.S.196, 204 (2008).

[11] Burdick v. Takushi, 504 U.S. 428, 434 (1992).

[12] Id. at 434.

[13] Anderson v. Celebrezze, 460 U.S. 780, 786 (1983) (internal quotes omitted).

[14] Id.

First Amendment protection for such interaction . . . is at its zenith."[15] Thus, adjustment of the deadlines to carry nominating petitions is important because carrying (and circulating) a petition are core First Amendment rights.[16] Actions restricting ballot access are subject to exacting scrutiny because petition carrying "involves both the expression of a desire for political change and a discussion of the merits of the proposed change."[17] Likewise, in Meyer v. Grant, the U.S. Supreme Court noted that "[l]egislative restrictions on advocacy of the election or defeat of political candidates are wholly at odds with the guarantees of the First Amendment."[18]

Mr. Mohr does not facially challenge the New York State Election Laws. Instead, he challenges the County's failure to redistrict and reapportion. Rigid application of election deadlines will limit the field of candidates and citizens' rights to exercise political speech. In Rockefeller v. Powers, the Second Circuit Court of Appeals recognized that "[b]y limiting the choices available to voters, the State impairs the voters' ability to express their political preferences."[19] The political machine should not benefit from its own inaction by delaying the reapportionment process and then arguing that there is insufficient time to circulate petitions to prevent competing candidates from having a legitimate opportunity to vie for office this election

---

[15] Buckley v. American Constitutional Law Foundation, Inc., 522 U.S. 182, 186-187 (1999) (internal citations and quotes omitted).

[16] Chou v. New York State Board of Elections, 332 F. Supp. 2d 510, 514 (E.D.N.Y. 2004).

[17] Id. (internal citations and quotes omitted); Krislov v. Rednour, 226 F.3d 851, 858-859 (7th Cir. 2000) ("[a]ssociating for the purpose of placing a candidate on the ballot is one of the actions protected by the First Amendment. . . . Restrictions on ballot access, therefore, can violate several constitutionally protected interests.).

[18] 486 U.S. 414, 419-20 (1988) (holding that the circulation of an initiative petition involves "the expression of a desire for political change" and that any restriction on such core political speech must satisfy strict scrutiny).

[19] Rockefeller v. Powers, 74 F.3d 1367, 1377 (2d Cir. 1996) (citing Williams v. Rhodes, 393 U.S. 23 (1968)).

cycle. Indeed, "it is well-settled that the claimed deprivation of a constitutional right such as the right to a meaningful vote or to the full and effective participation in the political process is in and of itself irreparable harm."[20] This Court should reject any argument that plaintiff waited too long in seeking relief because the state and its subdivisions bear the burden of delays in litigation as opposed to a citizen seeking to exercise his rights.[21]

## Point III

## THERE IS NO ROADBLOCK TO PROTECTING BALLOT ACCESS

### A. Federal Law: UOCAVA and MOVE Acts

It is anticipated that parties whose self-interest is to maintain the status quo will attempt to convince the Court that ballot access is not feasible because of the time-frame and the purported obstacles that they will seek to erect. This Court should not heed those who offer excuses rather than solutions (again, an overt attempt to maintain the status quo). Protecting citizens' constitutional rights should be this Court's highest priority. Constitutional rights should never be sacrificed at the altar of expediency and political self-interest. This Court must remain steadfast against those who would do so.

At the July 21, 2011 conference, an issue was raised related to mailing military ballots for the primary election. The plain language of the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA") and the law amending it, the Military and Overseas Voter

---

[20] Puerto Rican Legal Defense and Education Fund, Inc. v. City of New York, 769 F. Supp. 74, 79 (E.D.N.Y. 1991) (citing *Reynolds v. Sims*, 377 U.S. 533 (1964)).

[21] Id. at 79.

Empowerment Act ("MOVE") shows that the statute will not impede ballot access.[22] The unambiguous language of the statute indicates that it applies only to federal elections as defined by the statute -- elections for President, Vice President, Congress, and Senate.[23] The statute is entirely devoid of any reference to a local election. In Romeu v. Cohen, the Second Circuit Court of Appeals held that UOCAVA only references federal law, noting that "[UOCAVA] preserves for a citizen formerly a resident in a State who moves outside the United States the right to vote in **federal elections** held in the citizen's previous State of residence."[24] Romeu held that UOCAVA requires states to extend voting rights in federal elections to former residents who reside outside the United States.[25] New York Election Law was amended to implement UOCAVA, classifying these voters as "special federal voters" entitled to vote in federal elections.[26]

Mr. Ward referenced a case pending in the Northern District before Judge Sharpe related to UOCAVA and MOVE. The N.D.N.Y. case, however, cannot depart from the Second Circuit's decision in Romeu – nor does it present any obstacle ballot access in any event.[27] Review of the United States's complaint indicates that New York was sued because of its alleged

---

[22] UOCAVA, 42 U.S.C. §§ 1973ff to 1973ff-7 and MOVE, Pub. L. No. 111-84, Subtitle H, §§ 579-589, 123 Stat. 1290, 2318-2335 (2009).

[23] "'Federal Office' means the office of the President or Vice President, or of Senator or Representative in, or Delegate or Resident Commissioner to, the Congress." UOCAVA, 42 U.S.C. § 1973ff-6(3).

[24] Romeu v. Cohen, 265 F.3d 118, 121 (2d Cir. 2001) (emphasis added); *see also* Casarez v. Val Verde County, 957 F. Supp. 847, 854 (D. Tex. 1997) (holding that UOCAVA "only applies to military personnel voting for **federal office**…"). (emphasis added).

[25] Romeu, 265 F.3d at 125.

[26] Id.; Election Law § 11-200(1).

[27] United States of America v. State of New York and The New York State Board of Elections, Case No. 1:10-CV-1214 (GLS/RFT) (N.D.N.Y. 2010).

lack of compliance with UOCAVA and MOVE related to the manner in which elections for federal offices were conducted.[28] There were no allegations about local elections. Similarly, the Consent Decree issued by Judge Sharpe addresses remedial measures related to 2010 federal elections – not local elections.[29] Recently, the federal government requested a status conference with Judge Sharpe because of its concern that New York will not be in compliance for the 2012 federal elections; the United States did not reference any local 2011 election in its letter.[30] In short, UOCAVA, as amended by MOVE, does not prevent this Court from adjusting deadlines to allow for an abbreviated petitioning process.

**B. New York State Statutory Issues**

Mr. Mohr's submission sets forth various deadlines under New York Election Law pertaining to ballot access. The information and corresponding discussion at the July 21, 2011 appearance provided the Court with some background information on this issue. As noted in Point I above, this Court may modify these deadlines.

The current deadline for finalizing the primary ballot is August 8, 2011[31] and absentee ballots for the primary will be sent to the military voters who have requested a ballot by August 12, 2011.[32] At the July 14, 2011 conference with the Court's staff, Messrs. Ward and Mohr indicated there is some flexibility in these deadlines. New York Election Law also states

---

[28] The complaint, consent decree and a follow up letter taken from the Northern District's PACER website are attached as Exhibit A.

[29] *See* Consent Decree at Exhibit A.

[30] *See* the United States of America's request for status conference dated June 29, 2011 at Exhibit A.

[31] Election Law § 4-110.

[32] Election Law § 10-108.

that if a candidate who appears on a military ballot is later found invalid, the ballot still is valid and a vote for that candidate is not counted.[33] Moreover, even if the Board of Elections fails to include a candidate's name or any amendment, referendum, proposition, etc., on the military ballot, the validity of the election will not be affected.[34]

Military ballots normally would not be sent out until after the ballot was finalized and any challenges to petitions pursuant to Election Law Article 16 were resolved.[35] However, in this particular case, there is no reason to delay mailing military ballots once requests are received because any error on the ballot would not be fatal to the election. In other words, military ballots may be distributed immediately upon conclusion of the petition process and there is no need to wait for the petition-challenge period imposed to play out because if a candidate is later invalidated from the ballot, that vote is not counted.

Absentee ballot deadlines are also flexible. A person may make an application by mail for an absentee ballot as late as September 6, 2011 or may make an in-person application as late as the day before the September 13, 2011 primary.[36] New York Election Law requires the Board of Elections to provide an absentee ballot as soon as it is practicable after a timely request has been made and it is determined that the requestor is entitled to a ballot.[37] Thus, there is enough time built into the statute to allow for finalizing the ballot in light of any order issued by this Court preserving ballot access.

---

[33] Election Law § 10-116.

[34] Id.

[35] The 14 day period to challenge petitions begins to run from the last date for filing designating petitions in accord with Election Law § 16-102(2).

[36] Election law § 8-400(2)(c,d)

[37] Election Law § 8-406.

Plaintiff Mohr has filed his ballot access memorandum. To the extent that Mr. Mohr's proposal comports with the public interests in ensuring popular access to the ballot and political association, the County Defendants do not disagree with it. The County Defendants, however, do oppose the suggestion (made by Messrs. Mohr and Ward) that political parties should be permitted to designate candidates for the office of county legislator. Such a process (favored by political insiders) fails to afford any dignity to the First Amendment rights to run for office and circulate petitions for candidates. Party designations would ensure that regular citizens interested in running for office as a county legislator would be all-but excluded from doing so. There is a reason that this process is statutorily limited to the rare situation where a vacancy arises after the time for circulating petitions. Courts have recognized that the application of § 6-116 is "an exception to the rule" that should be rarely and sparingly invoked.[38] It is not designed to select a slate of candidates for an entire legislative body.

Election Law § 6-116 is entitled "Party Nominations; election to fill a vacancy"; it provides a process where political parties hand pick candidates for office. This method of ballot access should be rejected. First, § 6-116 provides that a party may nominate "a candidate . . . to fill a vacancy." The Statute speaks of a single vacancy, not eleven vacancies for every seat in a

[38] Price v. New York State Board of Elections, 540 F.3d 101, 104 (2d Cir. 2008) (noting that § 6-116 applies "in the rare situations when such an office becomes vacant between early July and early November in a year when that office is up for election") (emphasis added); Montano v. Lefkowitz, 575 F.2d 378, 383 (2d Cir. 1978) (noting that "in those rare instances where committeemen perform public electoral functions (e.g., the nomination of candidates to fill vacancies or to run in special elections . . . )") (emphasis added); Shapiro v. Berger, 328 F. Supp. 2d 496, 500 (S.D.N.Y. 2004) (noting that § 6-116 is "an exception to the general rule"). Chapman's suggestion that Shapiro supports application of § 6-116 here should be rejected. Shapiro did not involve reapportionment or redistricting. Rather, that case involved the vacancy for a single town justice position. Moreover, the issue at stake here is not a candidates' right to a primary election, rather, it is the right of candidates to circulate nominating petitions and the rights of citizens to carry such petitions. The minor restriction of these Constitutional rights that arises when § 6-116 operates due to an unanticipated vacancy in a single office is a reasonable balancing by the State Legislature. The intrusion, however, is much greater where application of § 6-116 involves an entire county legislative body and where the "vacancy" is not unanticipated, but due to the Legislature's failure to enact a plan of reapportionment.

county legislature. Second, § 6-116 runs contrary to the public interest in an open and democratic nomination process and it should be restricted to situations where a candidate dies or withdraws from the race. As noted above, courts recognize that this is a rare event. Courts recognize that the "purpose of N.Y. Elec. Law § 6-116 is to encourage the democratic selection of officeholders in general elections, and to prevent appointees from serving any longer than necessary" and that it applies where a primary "would be impractical."[39] Here, on the other hand, it is not impractical to modify deadlines for circulating petitions and allowing candidates to stand for election in the primary. Moreover, applying § 6-116 here would run []. Extending § 6-116 to this situation would deny public participation and violate the First Amendment.[40] Finally, and of greatest significance, § 6-116 has not been applied in any published decision addressing reapportionment or redistricting. Rather, as this Court recognized in Kimble, it is feasible and appropriate to modify petition circulation deadlines in order to preserve ballot access for candidates seeking election as a county legislator. This Court should thus reject any suggestion that Election Law § 6-116 should serve as a template for ballot access under these circumstances.

Finally, the Board of Elections has not yet met to validate petitions that were filed on July 14, 2011. Accordingly, any petitions filed today would be no different than petitions that have been filed.

---

[39] Shapiro, 328 F. Supp. 2d at 503 500.

[40] The caucus approach suggested by Mr. Mohr at least provides a greater level of participation than does the party designation approach. Independent Nominating petitions have also been suggested, which requires a candidate to create their own party and requires them to obtain signatures from a number of voters equal to 5% of the vote in the gubernatorial election, which would, upon information and belief, amount to more than 1,000 petition signatures. As previously discussed at one of the in-chambers conferences, this route to access the ballot is quite rare, and the Elections Commissioners were only able to identify one possible occasion where it was ever successfully used.

## CONCLUSION

The County Defendants urge this Court to issue an Order granting interested candidates the ability to circulate nominating petitions for one week, with a reduced signature requirement of 200 for major party lines (and a similar reduction for minor party lines), to ensure that the election process is open to all citizens and to protect the fundamental First Amendment rights at issue.[41] The County Defendants' submit a proposed Order that would allow candidates to circulate petitions August 1-7, with petitions due to be filed on August 8 by noon.

Delay is the enemy of a free and open democratic process. Any alleged roadblock that anyone attempts to erect is an attempt to sacrifice Constitutional rights for the benefit of political self-interest. A party-designation approach to ballot access would only protect the status quo and those who happen to be in the good graces of the political machine. This Court, on the other hand, should strive to protect the public interest in the election process. As one court stated, postponements in the election process "favor incumbents and organized political parties over challengers and minority groups. . . . [and that] postponements will run counter to the objectives of both the constitution and the Voting Rights Act."[42] Likewise here, basic constitutional rights should not – and cannot – yield to partisan politics. This Court should adopt a plan that satisfies the citizens' rights under all applicable laws and which best satisfies other important public interests such as universal ballot access, fairness, equality, and good government.

Dated: July 28, 2011

**JEREMY A. COLBY, Erie County Attorney**
Attorney for Defendants

By: /s/ Jeremy A. Colby

---

[42] Puerto Rican Legal Defense and Education Fund, Inc. v. Gantt, 796 F. Supp. 681, 698 (E.D.N.Y. 1992).

                                                     Jeremy A. Colby
Anthony G. Marecki
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2200

TO: **RALPH M. MOHR, ESQ.**
5622 Broadway Street
Lancaster, New York 14086

**DENNIS E. WARD, ESQ.**
134 West Eagle Street
Buffalo, New York 14202

CC: **CANTOR, LUKASIK, DOLCE & PANEPINTO, PC**
(Marc C. Panepinto, Sean Cooney, Jerome D. Schad
and Jeffrey Marion, of Counsel)
1600 Main Place Tower
350 Main Street
Buffalo, New York 14202

**PERSONIUS MELBER LLC**
(Brian M. Melber, of Counsel)
2100 Main Place Tower
350 Main Street
Buffalo, New York 14202

**RONALD P. BENNETT, ESQ.**
Erie County Legislature
Old County Hall
92 Franklin Street, 4th Floor
Buffalo, New York 14202

**SHAWN P. MARTIN, ESQ.**
Erie County Legislature
Old County Hall
92 Franklin Street, 4th Floor
Buffalo, New York 14202

CERTIFICATE OF SERVICE

    I hereby certify that on July 28, 2011, I electronically filed the foregoing with the Clerk of the District Court using its CM/ECF system, which would then electronically notify the following CM/ECF participants on this case:

Marc C. Panepinto,
Sean Cooney,
Jeffrey Marion, and
Jerome Schad
Attorneys for Plaintiff Dennis Chapman
1600 Main Place Tower
350 Main Street
Buffalo, New York 14202
(716) 852-1888
mpanepinto@cldplaw.com
scooney@cldplaw.com
jeff@jeffmarionlaw.com
jerome.schad91@gmail.com

Brian M. Melber
Attorney for Defendant Erie County Legislature
Personius Melber, LLP
2100 Main Place Tower
Buffalo, New York 14202
bmm@personiusmelber.com

    And, I hereby certify that I caused the foregoing to be hand delivered, to the following non-CM/ECF participants:

Ralph M. Mohr
134 West Eagle Street
Buffalo, New York 14202

Dennis E. Ward
134 West Eagle Street
Buffalo, New York 14202

/s/ Jeremy A. Colby
Jeremy A. Colby
Erie County Attorney
95 Franklin Street, Room 1634
Buffalo, New York 14202
(716) 858-2200