UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

═══════════════════════════════════

RALPH M. MOHR and DENNIS CHAPMAN,

               Plaintiffs,

    v.                                 **DECISION AND ORDER**

ERIE COUNTY LEGISLATURE,             11-CV-559S
CHRISTOPHER C. COLLINS, as County
Executive of the County of Erie, and
COUNTY OF ERIE,

               Defendants,

and DENNIS E. WARD,

               Intervenor-Defendant.

═══════════════════════════════════

## I.  INTRODUCTION

Plaintiff Ralph M. Mohr commenced this action by filing a complaint with the Clerk of this Court on June 30, 2011.  Plaintiff Dennis Chapman commenced an action in New York State Supreme Court, County of Erie, which was removed to this Court on July 1, 2011 and assigned Docket No. 11-CV-560.

At a preliminary conference held on July 21, 2011, this Court issued a bench decision dismissing Plaintiff Chapman's second cause of action.  Chapman's sole remaining cause of action alleges the same violation and seeks the same remedy as does Plaintiff Mohr's complaint.  Plaintiffs both allege that Defendants' failure to adopt a county legislative redistricting and reapportionment plan for the 2011 election violates the one-

1

person one-vote requirement of the Equal Protection Clause.  Both seek a declaratory

judgment to that effect, imposition of a court-approved districting plan, and adjustments to

the requirements of Article 6 of the New York State Election Law for the 2011 legislative

election.  In light of the identity of issues, the Court proceeded, on July 21, 2011, to

consolidate the cases.

## II.  BACKGROUND

### A.    Facts

The facts underlying this action are not in dispute.  The County of Erie has adopted

a charter form of government, and is governed by both a county executive, elected on a

county-wide basis every four years, and a legislative body elected every two years from

legislative districts apportioned throughout the county.  Presently, the legislature is made

up of fifteen members.

The county's legislative districts now are due for reapportionment based on the 2010

federal census.  In addition, at the general election conducted on November 2, 2010, Erie

County voters approved a local law amending the Erie County Charter to reduce the

legislature from fifteen to eleven members effective with the term commencing January 1,

2012.

To adopt a plan for reapportionment and restructuring, the Erie County Legislature

is first required to conduct a public hearing and, thereafter, adopt by majority vote a local

law defining and describing by metes and bounds the boundaries of each district for the

county.  Upon passage of the local law, the County Executive must conduct a public

hearing and approve or disapprove the local law.  A local law that is disapproved is

returned to the Legislature, where such disapproval may be overridden by a two-thirds vote. A local law of reapportionment becomes effective upon filing with the office of the Secretary of State.

On June 16, 2011, the Erie County Legislature adopted a plan of reapportionment of eleven legislative districts by an eight to seven majority vote. County Executive Collins notified the Legislature on June 28, 2011 that he had disapproved the local law. To date, that disapproval has not been overridden by a two-thirds vote of the current fifteen members, and all parties agree that such a vote is not expected.

Plaintiffs' claims arise from the facts that there is no districting plan in place for the election of eleven county legislators in November 2011, and deviation among the populations of the fifteen former districts, if updated to reflect the 2010 census, is such that the principle of one-person, one-vote is violated. They seek imposition of a districting plan drawn in conformance with that principle.

In addition, Plaintiffs seek adjustments to the election schedule. This action was commenced three weeks <u>after</u> the first day for signing designating petitions (June 7) for a September 13 primary election, and just ten business days <u>before</u> the last day for filing such petitions (July 14). From the outset, then, it was a virtual impossibility for this Court to appoint a special master to recommend a redistricting plan, or to itself craft a redistricting plan, in a timeframe that would allow for the carrying and filing of designating petitions in accordance with deadlines established under New York's Election Law.

**B.    Procedural History**

This Court was of the belief that the most expeditious first step toward resolving this

litigation was to conference with counsel to evaluate their respective positions and differences.  The Court did so on July 8, 2011 and July 14, 2011, and it was determined, *inter alia*, that no facts were in dispute, the parties would not be able to agree on a reapportionment plan for the 2011 election, and there was no opposition to consolidating the two actions.

Counsel then appeared at a preliminary conference on July 21, 2011, at which the Mohr Defendants withdrew their pending motion to dismiss, and the Court ruled from the bench on the Chapman Defendant's motion to dismiss Chapman's second cause of action, consolidated the cases under Docket No. 11-CV-559, set a deadline for the parties to submit to the Court each eleven-district redistricting plan prepared by or presented to the Legislature, with all accompanying narratives, analysis and census data, and set a date for simultaneous briefing on the issue of adjusting ballot access.

All requested submissions have been filed, and this matter is ready for disposition.

### III.  DISCUSSION

**A.    Equal Protection**

Because both Plaintiffs allege that the current situation—*i.e.*, the absence of a districting plan based on the 2010 census—is unconstitutional, the Court will first discuss the principles underlying their claim.

The Equal Protection Clause of the Fourteenth Amendment to the United States Consititution provides that "[n]o state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States . . . ," one such privilege being the right to vote.  U.S. Const., Amend. XIV, section 1.

4

1.    *One-Person One-Vote*

In <u>Baker v. Carr</u>, the Supreme Court held that the failure to reapportion periodically may violate the Equal Protection Clause.  369 U.S. 186, 82 S. Ct. 691, 7 L. Ed. 2d 663 (1962).  The Supreme Court has explained that "any standard other than population equality, using the best census data available, would subtly erode the Constitution's ideal of equal representation."  <u>Karcher v. Daggett</u>, 462 U.S. 725, 731, 103 S. Ct. 2653, 77 L. Ed. 2d 133 (1983) (internal citation omitted).

At issue in <u>Karcher</u> was the allocation of congressional districts, and the Court held that absolute population equality should be the paramount objective in such plans.  *Id*. at 732-33.  In contrast, the Supreme Court affords greater flexibility to states and their subdivisions by requiring only "substantial" population equality.  <u>Gaffney v. Cummings</u>, 412 U.S. 735, 748, 93 S. Ct. 2321, 37 L. Ed. 2d 298 (1973).  The Court has recognized that a somewhat relaxed requirement for the States and their subdivisions may be necessary to allow for other legitimate state policies.  <u>Reynolds v. Sims</u>, 377 U.S. 533, 577-81, 84 S. Ct. 1362, 12 L. Ed. 2d 506 (1964).  Among the state policies the Supreme Court has recognized may justify some variance are: making districts compact, creating contiguous districts, respecting municipal boundaries, and preserving the core of prior districts. <u>Karcher</u>, 462 U.S. at 740.  Although the redistricting requirements of New York's Home Rule Law do not apply to charter counties such as the County of Erie, the statute does express the state's policy interests in achieving "substantially equal weight for all the voters," respect for municipal boundaries, fairness to political parties, and districts that are convenient, compact, and contiguous.  N.Y. Mun. Home Rule § 10(1)(a)(13)(a)(i-iv).

The Supreme Court has established that "minor deviations" from mathematical population equality are permissible to promote legitimate state policies, and that a plan with a maximum population deviation under ten percent falls within this category of minor deviations.  Voinovich v. Quilter, 507 U.S. 146, 161, 113 S. Ct. 1148, 122 L. Ed. 2d 500 (1993) (quoting Brown v. Thomson, 462 U.S. 835, 842, 103 S. Ct. 2690, 77 L. Ed. 2d 214 (1983).  Thus, redistricting plans with maximum deviations below ten percent have been held *prima facie* constitutional.  Marylanders for Fair Representation, Inc. v. Schaefer, 849 F. Supp. 1022, 1031 (D. Md. 1994) (collecting cases).

## 2.    *Minority Voting Strength*

The Equal Protection Clause also guarantees that an individual's right to vote may not be infringed on the basis of race.  Reynolds, 377 U.S. at 566.  In addition, the Voting Rights Act of 1965, as amended, prohibits any districting plan that "results in a denial or abridgement of voting rights on the basis of race, color, or language." 42 U.S.C. § 1973(a). "A violation of [the Act] is established if, based on the totality of circumstances, it is shown that . . . members [of a racial minority] have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." *Id*. § 173(b).  Violations can be avoided or corrected by creating majority-minority voting districts that maximize the voting opportunities of members of the affected group.  Kimble v. County of Niagara, 826 F. Supp. 664, 670-71 (W.D.N.Y. 1993) (citations omitted).

## B.    **Redistricting and Reapportionment**

This Court first determined that it was more expedient to immediately take on the task of selecting or crafting a districting plan than to identify and task a special master with

that process.  I have carefully considered each eleven-district plan prepared by or presented to the Legislature, all accompanying information and analysis, and written testimony from the public hearings on local laws 3-1 and 5-1 pertaining to reapportionment[1], in light of the foregoing constitutional and statutory considerations.

I will start with the plans generated by the Legislature and the criticisms of those plans as reflected in the written comments from the various impacted communities.  While there were no specific allegations of unconstitutionality or statutory violations, both plans were characterized as flawed, unfair, and "political," with town and village officials expressing disappointment with both options and the fact that these were the only options presented.  The most common criticism of proposed Local Law 3-1 is that it does not respect municipal boundaries and unnecessarily divides smaller communities.  Proposed Local Law 5-1 is criticized for creating a "mega-district" that encompasses 45 percent of the county's landmass, and for separating towns that share school districts and services.  Without discussing in detail each outside plan presented to the Legislature, none were without flaws.  Some include a population deviation in excess of 10 percent, a number include the types of district lines that prompted criticism of both the proposed local laws, and some do not appear to have done everything reasonably possible to maximize minority voting opportunities.

This Court's options for resolution include selecting a plan among those offered, drawing on portions of particular plans, or creating a new plan.  After considering these options in light of the legal requirements and existing plans, I have chosen the latter, and

---

[1]  Local Law 3-1 is the plan proposed by Legislature Chairwoman Miller-Williams.  Local Law 5-1 is the proposal passed by the Legislature, but disapproved by the County Executive.

a new districting plan is attached to this Decision and Order as Appendix A.

The eleven new districts have a maximum population deviation of less than 10 percent.  The average district population is 83,549, and districts range from -3.38 percent to +3.31 percent, for a total deviation of 6.69 percent.   The following considerations account for these minor deviations.

• The plan includes two majority-minority districts within the City of Buffalo.  District 1 has a total population of 83,361, comprised of 58.38 percent Black and 11.7 percent Hispanic, and District 2 has a total population of 83,502, comprised of 53.24 percent Black and 10.07 percent Hispanic.

• To the greatest extent possible, municipal boundaries are respected, with splits in only the City of Buffalo, and the Towns of Amherst, Cheektowaga, and Tonawanda.

• To the extent made known to the Court through the written testimony, towns with shared services have been included in the same district.

• Where so much of Erie County remains rural, it is unavoidable that downsizing result in larger—and perhaps significantly larger—districts.  Nevertheless, this plan endeavors to minimize that unavoidable consequence to the greatest extent possible.  All districts are contiguous and have been given as convenient and compact form as possible.

• Another unavoidable consequence of fewer districts is that some will include more than one incumbent.  In this plan, each new district includes at least one incumbent, and none includes more than two.

• The plan does not favor one political party over another.  In a county where a large majority of voters are registered Democrats, three districts have a Republican majority (Districts 6, 9 and 11).

Absent agreement among the responsible branches of county government, it is this plan that this Court believes best serves the voters of Erie County.  And, it is the plan that will govern through the remainder of this decade—*i.e.*, until 2020 census data becomes available.

A plan having been drawn, the issue of implementation remains.  The Court will

provide to the Erie County Board of Elections[2] forthwith, the information necessary to define the boundaries of each district by metes and bounds, and will communicate with the Board of Elections should any questions arise during that process.  The Board of Elections shall make its best efforts to generate metes and bounds within two business days of receipt of the underlying data and shall take or supervise all steps necessary to give effect to the appended redistricting plan.

**C.     Adjusting Ballot Access**

In addition to redistricting, Plaintiffs request adjustments to the requirements of New York's Election Law to allow potential candidates reasonable access to the ballot for the 2011 primary and/or general elections.  All parties have submitted briefing on this issue.  Only the Erie County Legislature took "no position with regard to what particular process should be followed to qualify party candidates and/or independent candidates" for legislative seats.  (Docket No. 24 at 1.)

**1.     *The Primary Election***

a.     The Petition Process

Plaintiff Mohr and Defendants County of Erie and the County Executive urge that the election calendar and requirements be adjusted to allow for the circulation and filing of designating petitions for the primary election.   Under the 2011 election calendar, designating petitions for the September 13 primary election were to have been filed on July 14, 2011, N.Y. ELEC. LAW §6-158(1), and the last day for the State Board of Elections to certify the primary ballot of candidates who filed petitions is Monday, August 8, 2011 (*Id.*

---

[2]  Although Plaintiff Mohr and Defendant Ward are litigating this case in their individual capacities, both are Election Commissioners at the Erie County Board of Elections.

§ 4-110).

In their brief, filed on July 28, 2011, Defendants County and County Executive suggest that, even though district boundaries were not then determined, it would be possible to resolve redistricting and map district boundaries in one business day such that candidates could circulate petitions from August 1 through 7, with filing to be accomplished by the August 8 deadline for certifying the ballot for the primary.  Although the County's desire for ballot access is laudable, the implausibility of this proposal cannot be overstated.

The County also urges that this Court's decision in Kimble is precedent for making adjustments to the petition process in this case.  826 F. Supp. 664.  I disagree.  The circumstances in Kimble were markedly different than those presented here.  First, that action was commenced on May 28, 1993, before the scheduled commencement of the petition process, not three weeks after.  Second, Kimble involved reapportionment only, not downsizing, and candidates proceeded to circulate petitions on June 8, the first possible day, within the then-existing district bounds.  Third, the litigants continued to attempt to resolve their differences and did resolve the matter by consent decree on June 30, while the time for circulating petitions remained open.  Here, that time expired three weeks ago.  Finally, in Kimble, the parties did not consent to adjustments to the election calendar.  Rather, in light of the belated boundary adjustments, it was agreed that the signature requirements would be modified.

The many factors to be considered here, including possible challenges to petitions, certification of the ballot, mailing of military and absentee ballots, and the like, simply do not favor a petition process at this late date.   The loss of primary opportunities, which the

County contends will favor incumbents and political parties over challengers, have occurred due to the county government's own inaction, and those responsible have only themselves to blame for any resulting disservice to the residents of Erie County.  <u>Kimble</u> is relevant to this matter to the extent it serves as an example of what can be achieved through cooperation.

b.      <u>"Recognized Candidates"</u>

Plaintiff Mohr suggests two alternative methods for placement on a primary ballot, the first of which is a "recognized candidate" standard.  This scheme would involve a direction to the board of elections to place on the primary ballot an enrolled party member whose interest in the seat has been covered by the media, and who has met certain other requirements.  Mohr cites one case in support, <u>LaRouche v. Kezer</u>, 990 F.2d 36 (2d Cir. 1993), on appeal from the District of Connecticut.

A recognized candidate standard is rejected for two reasons.  First, Connecticut has a statute which directs the use of this method, whereas New York state does not.  Second, Connecticut's statute authorizes this method solely for presidential elections, where widespread national and statewide media coverage is expected.

c.      <u>Candidate's Application to the Court</u>

Plaintiff Mohr, citing <u>Molinari v. Powers</u>, 82 F. Supp. 2d 57 (E.D.N.Y. 2000), also suggests that potential candidates can apply to the Court for placement on the ballot.  He offers no explanation of the relevance of this decision, which involved a challenge by and on behalf of presidential candidates to the constitutionality of ballot access rules for the primary to be held by the New York Republican State Committee in 2000.  I find nothing

in this decision that supports a scheme by which potential county legislative candidates would apply to this Court for placement on a primary ballot.

* * * * *

In sum, I find that, at this juncture, there are no reasonable adjustments that can be made that would allow for a primary election relative to the eleven new legislative districts.

**2.    *The General Election***

a.    <u>Election Law § 6-116</u>

Both Plaintiffs, along with Defendant Ward, urge that, in the absence of a primary, Section 6-116 of the Election Law can be implemented.  That provision states, in pertinent part, that:

> A party nomination of a candidate for election to fill a vacancy in an elective office required to be filled at the general election, occurring after seven days before the last day for circulating designating petitions . . ., shall be made, after the day of the primary election, . . . by a majority vote of a quorum of the members of a county committee or committees last elected in the political subdivision in which such vacancy is to be filled . . . .  A certificate of nomination shall be filed as provided for herein.

The County and County Executive object to its use on the ground that "[i]t is not designed to select a slate of candidates for an entire legislative body."  (Docket No. 23 at 11.)  This Court agrees that the circumstances here are far different than those in which this provision ordinarily is invoked—specifically, where a vacancy occurs due to death or resignation between early July and early November in a year when the office is up for election, <u>Price v. New York State Bd. of Eclections</u>, 540 F.3d 101, 104 (2d Cir. 2008), or where a special election is called.  Nevertheless, the fact is that the eleven new districts created by this Order are all vacant, and those vacancies occurred "after seven days

12

before the last day for circulating designating petitions."   Accordingly, I find the use of Section 6-116 is proper and will ensure a slate of candidates for the primary election.

> b.   Independent Nominating Petitions

Defendant Ward suggests that a candidate's ability to gain access to the general election ballot through the use of the independent nominating petition process is sufficient to address his or her First Amendment right of association.   New York State Bd. of Elections v. Lopez Torres, 522 U.S. 196, 202-204, (assuming right of association includes right to run, in addition to right to vote, New York's signature petition requirements are entirely reasonable).

The first day to sign independent nominating petitions for the general election was July 12, 2011, N.Y. ELEC. LAW §6-138(4), and the last day to file such petitions is August 23, 2011, id. § 6-158(9).   Ward contends that "some adjustment" to the filing deadline could be made without severely impacting the general election timetable.   He does not offer a date after which the impact would be "severe."

To date, the circulating of independent nominating petitions has been delayed by 23 days.  Under the 2011 election calendar, September 20 is the last day to file certificates of party nomination to fill vacancies under Section 6-116, and October 3 is the last day for the State Board of Elections to certify the general election ballot.  (Id. §§ 6-158-6 and 4-112(1).)   In light of these dates, the Court finds an extension for filing independent nominating petitions of 23 days, to September 15, 2011, will not severely impact the general election timetable.

13

      c.     <u>Party Caucuses</u>

Although Plaintiff Mohr identified Section 6-116 as a practical means of selecting candidates in these circumstances, he suggests that party nominations made by caucus would be preferable to having party bosses make those determinations.  He does not dispute Defendant Ward's contentions that state law does not contemplate the use of caucuses in other than small political subdivisions, and that notification to tens of thousands of registered party voters and the identification of venue(s) for such caucuses would be cumbersome and time-consuming.

The timing of this lawsuit favors the most expedient approach to ballot access within constitutional bounds.  It is the opinion of this Court that party caucuses, even if permissible in these circumstances, simply are impractical.

* * * * *

In sum, I find that the use of Section 6-116 of New York's Election Law, and the extension of the filing date for independent nominating petitions to September 15, 2011 are appropriate means of securing ballot access for the position of County Legislator in the general election on November 8, 2011.

## IV.  CONCLUSION

For the reasons stated, Erie County is divided into eleven legislative districts and apportioned in accordance with 2010 census data as shown in Appendix A hereto, with metes and bounds to be established by the Erie County Board of Elections in accordance with this Decision and Order.  Ballot access is adjusted to provide for certificates of party nomination under Section 6-116 of the Election Law, and to extend the deadline for filing

independent nominating petitions to September 15, 2011.

## IV.  ORDERS

IT HEREBY IS ORDERED that Plaintiffs' requests for relief are GRANTED and this

action is DISMISSED.

FURTHER, that the Clerk of the Court is directed to close this case.

SO ORDERED.


Dated:        August 4, 2011
              Buffalo, New York


                                        /s/William M. Skretny
                                       WILLIAM M. SKRETNY
                                           Chief Judge
                                     United States District Court